Filed 6/10/26  Bryant v. Rowe CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| KIMBERLY BRYANT,<br><br>Objector and Appellant,<br><br>v.<br><br>LISA A. ROWE, as Trustee, etc.,<br><br>Defendant and Respondent. | A173386<br><br>(Humboldt County Super. Ct. No. PR2300075) |

Kimberly Bryant, her sister, Lisa A. Rowe, and their two brothers are beneficiaries of a trust originally established by their parents.  This dispute arose after their mother passed away and the siblings found an instrument handwritten by their mother that appeared to change the division of their mother's assets upon her death.  Bryant appeals the trial court's ruling that the handwritten instrument had no legal effect on the division of the trust assets.  We reverse the trial court's order and remand for further proceedings.

### BACKGROUND

### A.

With the assistance of a lawyer, Kent and Sherrey Bishop established a trust in 2020 that named three of their four adult children as beneficiaries: Rowe, Matthew Bishop, and Kent

1

Bishop, Jr.[1]  Bryant, the couple's fourth child, was not a beneficiary.

After her husband died, the same lawyer helped Sherrey amend the trust to add Bryant as a beneficiary.  In December 2020, Sherrey, the settlor and trustee, executed the First Amendment and Restatement of The Kent and Sherrey Bishop 2020 Trust (hereinafter "Trust").  The Trust provided that, upon Sherrey's death, Rowe would serve as successor trustee and would receive Sherrey's house, bank accounts, and pets.  A family friend would receive a $10,000 gift.  Sherrey's personal property would go to persons named in a separate personal property memorandum, or otherwise to Rowe.  The remainder of the estate would be divided equally between the four siblings—Bryant, Rowe, Matthew, and Kent Jr.

The Trust provided, referring to Sherrey, that "I may at any time during my lifetime amend any of the terms of this Trust by an acknowledged instrument in writing signed by me which shall refer to this Trust and this specific power and which shall be delivered to the then-acting Trustee."

In 2021, on the day before Thanksgiving, Matthew and Kent Jr. got into a fight at Sherrey's house and Kent Jr. hit his brother.[2]  Afterward, Sherrey was upset and cancelled the family's Thanksgiving plans.

---

[1] Because Sherrey, her husband, and her two sons all share the same last name, this opinion refers to each of them by their first names, except that Kent Bishop, Jr., is referred to as Kent Jr.

[2] Around the same time period, according to Rowe, she had told Matthew that "Mom and dad had left me the house and had left the stocks to my siblings."  Rowe recounted that shortly before Thanksgiving, her mother and Kent Jr. called her on the phone, upset, and asked her about what she had said to Matthew about the estate.

2

On Thanksgiving day, November 25, 2021, Sherrey handwrote an instrument, comprising two pages of lined paper, entitled "Changes to be made to my well."[3]  The handwritten instrument begins: "Nov. 25[,] 2021[.]  On this day I'm (Sherrey Lee Bishop) re-writing my will.  The legal responsibilities, such as transfers of properties and acounts has already been done.  The one provision I'm changing is the division of all bank accounts, stock holdings, and real properties.  They are to be divided equally, ¼ each to my four children: Matt A. Bishop, Lisa A. Rowe, Kimberly A. Bryant and Kent A. Bishop Jr."

The second paragraph provides that "[u]pon my death," Sherrey's house "is to be sold" with "[t]he profits to be divided ¼ ea[.] to my 4 children named."

In the third paragraph, the handwritten instrument states that a "prepared list of items in the house is being worked on."

The fourth paragraph provides that Sherrey's car, an "MG[,] goes to" her grandson, "Zack Rowe."

The fifth paragraph states that "[i]tems that the 4 children received are to be kept within the family."  Immediately below this sentence, Sherrey drew a bracket enclosing approximately 15 blank lines; in the margin, alongside the bracket, she wrote: "Room for additional thoughts as needed."

The final paragraph of the handwritten instrument states: "These changes will be given to the Law firm that prepared my first will.  This paper will be their guide showing a change in my wishes.  Lisa Rowe will still be named to receive my death benefit from the Cal Teachers fund.  It will be in the amount of 6,000.00 plus."

---

[3] Excerpts from Sherrey's handwritten instrument quoted in this opinion reflect the instrument's original spelling and grammar.

3

At the end of the instrument, Sherrey printed out her name, "Sherrey L Bishop," and signed in the line above her name. Next to her signature, she wrote: "Date 11-25-2021," "1:06 PM," and her home address. Sherrey did not inform her lawyer of the handwritten amendment to her trust.

Sherrey died approximately one year later. She had considered her estate plan private. No one knew what was in the trust and no one was aware of the existence of the handwritten instrument until after Sherrey's death.

Kent Jr. found the handwritten instrument a few days after Sherrey died, when the four siblings had gathered at the family home. Kent Jr. and Bryant's husband had been going through Sherrey's papers to organize her unpaid bills. Kent Jr. found the handwritten instrument in a basket that Sherrey kept by her chair. Sherrey had used the basket to keep miscellaneous papers, including bills that were not yet due, notes that she had written to Kent Jr., letters she had typed to her grandchildren, opened mail, junk mail, and magazines. The Trust was in a green binder that was found in a separate location in Sherrey's bedroom.

**B.**

Rowe, as the successor Trustee to the Trust, filed a petition in trial court seeking instructions as to whether the handwritten instrument qualifies as an amendment to the Trust. Bryant objected to the petition, asserting that the handwritten instrument was effective in amending the Trust.

In concluding that the handwritten instrument had no effect on the Trust, the trial court reasoned that the Trust specified an exclusive procedure for amendment. The court concluded that the amendment procedure was exclusive because it used the mandatory word "shall," referring to "an acknowledged instrument in writing signed by me which *shall*

4

refer to this Trust and this specific power and which *shall* be delivered to the then-acting Trustee." (Italics added.) Given that the handwritten instrument did not satisfy the amendment procedure specified in the Trust, the court held that the instrument was not effective. Accordingly, on April 21, 2025, the trial court issued an order directing Rowe to dispose of Sherrey's estate in a manner consistent with the Trust.

## DISCUSSION

### A.

Bryant asserts that the trial court erred in concluding that the Trust sets forth an exclusive method for amendment. Reviewing the question de novo, we agree that the trial court erred. (See *McGee v. State Dept. of Health Care Services* (2023) 91 Cal.App.5th 1161, 1169 ["Absent a conflict in relevant extrinsic evidence, the interpretation of a trust instrument is a question of law which we consider de novo."].)

Probate Code section 15402[4] provides that "[u]nless the trust instrument provides otherwise," a settlor may modify a revocable trust by using the procedures for revocation of the trust. Section 15401, subdivision (a), provides that a settlor may revoke a revocable trust either (1) "[b]y compliance with any method of revocation provided in the trust instrument," or (2) "[b]y a writing, other than a will, signed by the settlor . . . and delivered to the trustee during the lifetime of the settlor." However, the second option (the statutory method) is not available "[i]f the trust instrument explicitly makes the method of revocation provided in the trust instrument the exclusive method of revocation." (§ 15401, subd. (a)(2).)

---

[4] Undesignated statutory references are to the Probate Code.

In *Haggerty v. Thornton* (2024) 15 Cal.5th 729 (*Haggerty*), our Supreme Court held that section 15401's "method is available for modification unless the trust instrument 'provides otherwise' by expressly precluding it or by explicitly making a different procedure exclusive." (*Id.* at p. 741.) *Haggerty* rejected a line of cases holding that a trust " 'provides otherwise' " under section 15402—meaning it precludes use of the statutory modification procedure—"if any modification method is specified in the trust, regardless of whether that method" is explicitly exclusive. (*Id.* at p. 737.) *Haggerty* reasoned that "a trust instrument that merely specifies a method of modification without limiting settlors to the use of that method does not preclude the use of the revocation procedures and therefore does not 'provide[ ] otherwise' from the general rule." (*Id.* at p. 736.) Under *Haggerty*, "[i]f a trust were to provide that it '*may only* be modified by an acknowledged instrument in writing,' then the trust would preclude modification via any different method of revocation, including the statutory method." (*Id.* at p. 740.) However, "if a trust were to simply provide that it '*may* be modified by an acknowledged instrument in writing,' then the trust would not preclude modification via any method of revocation." (*Ibid.*)

In reaching its conclusion, *Haggerty* relied on the legislative history of sections 15401 and 15402, which were enacted in part "to expand the availability of the statutory method for both revocation and modification" in keeping with recommendations made by the California Law Revision Commission. (*Haggerty, supra,* 15 Cal.5th at pp. 734-735, 737-738.) The Commission sought to respond to court decisions that had held that when a trust prescribes a procedure for revocation, the prescribed method must be followed rather than the statutory method. (*Id.* at pp. 739-740.) According to the Commission, the "prior 'rule may be criticized as defeating the clear intention of the settlor who attempts to revoke a revocable trust by the statutory method.' " (*Id.* at p. 740.) Indeed, " 'the settlor may

6

have forgotten about the method provided in the trust, or may not be aware of the case-law rule [that prescribing another procedure in the trust instrument would displace the statutory method].' " (*Ibid*.)  Under the Commission's proposed law, the statutory method of revocation is available " 'except where the trust instrument explicitly makes exclusive the method of revocation specified in the trust.  This allows a settlor to establish a more protective revocation scheme' " to address concerns about undue influence or lack of capacity, " 'but also honors the settlor's intention where the intent to make the scheme exclusive is not expressed in the trust instrument.' " (*Ibid*.)

Applying *Haggerty* here, we see no expression of intent that the trust's amendment procedure be exclusive.  The Trust provides (referring to Sherrey) that "I *may* at any time during my lifetime amend any of the terms of this Trust by an acknowledged instrument in writing signed by me which shall refer to this Trust and this specific power and which shall be delivered to the then-acting Trustee." (Italics added.)  The provision concerning amendment contains no language conveying exclusivity, using the permissive term "may" rather than the limiting phrase "may only."  (See *Haggerty*, *supra*, 15 Cal.5th at p. 740.)  Nor does the Trust expressly prohibit the use of the statutory revocation procedure.  (See *id*. at p. 733.)

Rowe argues that the amendment language must be construed in light of the Trust's "Governing Law" provision, which states that the Probate Code, beginning with section 15000, shall govern interpretation of the Trust "except as shall be specifically modified herein."  But Rowe's argument merely begs the question whether the amendment language in fact "specifically" modifies the statutory rule.

Rowe next points to the amendment provision's use of the word "shall" to require that the writing refer to the trust and be

7

delivered to the trustee. As Rowe notes, another provision of the Trust provides that "[u]nless otherwise specifically provided in this agreement or by the context in which used, I use the word 'shall' in this Trust to command, direct or require." Rowe's contention ignores the fact that the amendment provision begins with the permissive term "may." And the Trust defines "the word 'may' " to mean "to allow or permit, but not require." In context, the Trust provides that the settlor "may," but need not, use its method for amendment. The fact that the method requires certain procedures does not make the method mandatory in the first instance.

In *Tarrant Bell Property, LLC v. Superior Court* (2011) 51 Cal.4th 538, our Supreme Court construed statutory language that followed the word "may" with a phrase that included the word "shall." (*Id.* at p. 542.) The statute in question provided that "a referee '*may* be appointed' if, upon motion, a court finds that [an] agreement exists between the parties 'that provides that any controversy arising therefrom *shall* be heard by a referee.' " (*Ibid.*) *Tarrant Bell* concluded that notwithstanding the subsequent use of the mandatory word "shall," the earlier word "may" should be construed as permissive. (*Ibid.*) As a result, our Supreme Court rejected the argument that the subsequent use of the word "shall" meant that the statute "*required* the trial court here to . . . appoint a referee." (*Ibid.*) Similarly here, the amendment provision's subsequent use of "shall" to specify the substance of the amendment method does not transform the method itself, which the settlor "may" elect to use, into an expressly mandatory one.

**B.**

Rowe asserts that we should nonetheless affirm the trial court's decision on the ground that Sherrey's handwritten instrument is not effective because it lacks intent to amend the Trust. We conclude that remand on this question is appropriate.

8

In interpreting a trust instrument, our "primary duty . . . is to give effect to the settlor's intentions." (*Barefoot v. Jennings* (2020) 8 Cal.5th 822, 826.) Before a purported trust instrument may be given effect, however, "it must first ' "appear that [the] decedent intended to make a testamentary disposition *by that particular paper.*" ' " (*Trotter v. Trotter Van Dyck* (2024) 103 Cal.App.5th 126, 135 (*Trotter*).) The question is whether the settlor intended to amend the trust by that writing, rather than by some subsequent instrument or action. (*Ibid.*) In determining whether a writing is intended to effectuate a disposition of property, the court may look to the words of the instrument itself as well as the circumstances surrounding its creation. (See *Estate of Berger* (2023) 91 Cal.App.5th 1293, 1305-1306 (*Berger*).)

For example, *Berger* held that a decedent's handwritten letter was intended to make a testamentary disposition in light of the contents and level of formality of the letter. (*Berger*, *supra*, 91 Cal.App.5th at pp. 1307-1308.) In addition to naming the decedent's beneficiary and listing her most significant assets, the letter used the phrase " 'in the event of [her] death,' " recited the decedent's full name and address, and included a formal signature line along with the date, time, and location of signing. (*Ibid.*) The letter was also written at a time when the decedent was thinking about her own mortality, as she was scheduled to undergo a major surgery. (*Id.* at p. 1308.) Further, the fact that the decedent did not have subsequent discussions about the instrument with her family or others, or that she may have forgotten about it in later years, had no bearing on the court's inquiry, which concerned the decedent's intent at the time she executed the instrument. (*Id.* at pp. 1309-1310.)

In *Trotter*, the decedent had sent emails and completed a questionnaire indicating that she planned to make changes to her will and trust, but her writings anticipated that her lawyer would formalize her wishes by " '*redoing* the will and trust.' " (*Trotter*,

9

*supra*, 103 Cal.App.5th at p. 135.) The writings expressly anticipated further discussions with the decedent's lawyer, indicated that the decedent was still working on coming up with a list of items to be distributed to her children and grandchildren, and stated that she would " 'prefer' " to disinherit one of the original beneficiaries " 'if possible.' " (*Id.* at pp. 135-137.) In light of the anticipatory and precatory nature of the writings, *Trotter* concluded that they did not show that the decedent intended the writings themselves to amend her trust. (*Ibid.*)

Here, Rowe contends that we should apply substantial evidence review to the trial court's "implied finding" that the handwritten document lacked intent to amend the Trust. However, the trial court made no determination as to whether Sherrey's handwritten instrument itself was intended to amend her Trust; the court simply never reached this issue in light of its conclusion that the handwritten instrument was ineffective for failure to comply with the Trust's amendment procedure.

In these circumstances, remand is appropriate to allow the trial court to consider, in the first instance, the question whether the handwritten document was intended to amend the Trust. On remand, the trial court will have the opportunity to make any necessary fact findings as to the circumstances surrounding the creation of the handwritten instrument. (See *Berger*, 91 Cal.App.5th at pp. 1305-1306.)

## DISPOSITION

The trial court's April 21, 2025 order is reversed and the case is remanded for a determination as to whether the handwritten instrument was intended to amend the Trust and further proceedings consistent with this opinion.

                                                                    BURNS, J.

WE CONCUR:


JACKSON, P. J.
SIMONS, J.

*Bryant v. Rowe (A173386)*